# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| **In Re:**<br><br>**Eduardo L. Sarria and Heather R. Sarria,**<br><br>                    **Debtors.** | **Bankruptcy Case<br>No. 18-00572-JMM** |
| **JA, LLC d/b/a Leku Ona,**<br><br>               **Plaintiff,**<br><br>**vs.**<br><br>**Eduardo L. Sarria,**<br><br>               **Defendant.** | **Adv. Proceeding<br>No. 18-06019-JMM** |

## MEMORANDUM OF DECISION

### *Introduction*

Before the Court is an adversary proceeding in which JA, LLC d/b/a Leku Ona

("Plaintiff") objects to the discharge of a debt owed to it by Eduardo Sarria ("Defendant")

MEMORANDUM OF DECISION − 1

under § 523(a)(2)(A).[1][2]  Dkt. No. 1.  Plaintiff alleges Defendant incurred a debt to

Plaintiff by false pretenses, false representations, or actual fraud when he billed Plaintiff

for food and wine he did not deliver.

On May 15 and 16, 2019, the Court conducted a trial during which the parties

presented evidence, examined witnesses, and made oral arguments.  Dkt. Nos. 170, 173.

At the conclusion of the trial, the Court took the matter under advisement.  The Court has

considered the evidence and arguments, and this Memorandum of Decision sets forth the

Court's findings, conclusions, and reasons for its disposition of the adversary proceeding.

Rule 7052.

### *Factual Background*

*A. The Business Relationship and Delivery Procedures*

Plaintiff is a Basque restaurant and hotel in downtown Boise, owned and operated

by Joe Artiach ("Artiach").  The restaurant's day-to-day operations were not managed by

Artiach.  During 2014 and 2015, Defendant owned and operated a food and beverage

import and distribution company known as Basque County Imports, Inc. ("BCI").[3]  At

---

[1] Unless otherwise indicated, all chapter references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

[2] Plaintiff's complaint also named Ms. Heather Sarria as a defendant.  At the conclusion of the trial, the Court granted an oral motion to dismiss Ms. Sarria from the case because the evidence did not show that she defrauded Plaintiff.  This left Eduardo Sarria as the lone remaining defendant.

[3] BCI was an Idaho corporation originally owned by the Defendant's father, Justo Sarria.  Justo operated BCI until 2009, at which time he retired and transferred a 50% ownership share to Defendant and a 50% ownership share to Defendant's sister, Amaya Sarria.  Per Defendant's testimony, he operated BCI with Amaya until July 2013, at which point Amaya stopped participating in BCI's day-to-day affairs.  Defendant operated the corporation on his own from July 2013 until August 5, 2015, when the

MEMORANDUM OF DECISION – 2

some point prior to 2011, Defendant approached Artiach hoping to establish a business relationship under which Defendant would supply food and wine to Plaintiff. Due to a history of acrimony between Artiach and Defendant's father, Justo Sarria, Artiach was initially reluctant to work with Defendant. Nonetheless, Defendant persisted and in 2011, Artiach agreed to allow Defendant to work with Artiach's son, Andoni ("Andoni"), to supply Plaintiff with food and wine from BCI.

Defendant delivered food and wine from BCI to Plaintiff from 2011 until May 2015. He would visit the restaurant to determine what wine and food was needed and then return with the goods a few days later. When Defendant delivered goods to Plaintiff, he would leave a hand-written invoice detailing what was delivered and the amount due based on the delivery. Sometimes, Defendant would leave the invoice with Andoni or another of Plaintiff's employees. At other times, if no one was available to check in the delivery, Defendant would leave the invoice in a box outside of Andoni's office. Within a few days after receiving the invoice, Plaintiff would pay BCI by check.

---

corporation was dissolved during a special joint meeting of directors and stockholders attended by Defendant and Amaya Sarria.

In Idaho, an action for fraudulent misrepresentation is a tort. *See, e.g.*, *Sowards v. Rathbun*, 8 P.3d 1245, (Idaho 2000) (holding that prevailing party attorney's fees were not available because a fraudulent misrepresentation claim sounds in tort, not contract). Under Idaho law, "[a] director who participates in a tort is personally liable to the victim, even though the corporation might also be vicariously liable . . . The same is true for corporate officers." *FTE Networks v. Ivie (In re Ivie)*, 587 B.R. 729, 736 (Bankr. D. Idaho 2018). Thus, even though Defendant may have been acting in his fiduciary capacity as an agent of BCI during 2014 and 2015, to the extent he participated in any tortious conduct on behalf of BCI, he is personally liable for any tortious damages he may have caused.

MEMORANDUM OF DECISION − 3

At trial, witness testimony about the extent of Plaintiff's employees' inspection of the food and wine delivered by BCI revealed an informal, inconsistent process. Marisa Lopez ("Lopez"), Plaintiff's restaurant manager during early 2015, testified BCI would leave food products in an open area outside of Andoni's office, and wine would be left outside of a wine cellar down the hall. Sometimes one of Plaintiff's employees would be present to review and accept the delivery. At other times, the delivery was not reviewed. Sometimes the Plaintiff's employees would check the products in and then sign an accompanying invoice, signifying the products were received and that the invoice should be paid. *See, e.g.*, Ex. 101 at 39. At other times, invoices were paid despite the absence of a signature. *See, e.g.*, Ex. 101 at 29.

If a BCI delivery was checked in, it was reviewed either by members of Plaintiff's kitchen staff, by Plaintiff's accountant, or by Andoni or Lopez. Artiach testified that, at other times, BCI deliveries were not inspected at all because he trusted Defendant to deliver the products listed on the invoices. Andoni testified that check-in standards were relaxed for Defendant because of his personal relationship with Andoni. Andoni also said he reminded Defendant about product delivery procedures "monthly" from 2012 to 2015, asking Defendant to deliver products at times when they could be checked in by one of Plaintiff's employees. Andoni claims Defendant complied sporadically and only to the extent necessary to temporarily appease Andoni. Defendant denies he was given such reminders and insists he always delivered what was invoiced and then called Andoni to let him know a delivery had been made.

MEMORANDUM OF DECISION – 4

In sum, Plaintiff's informal, inconsistent method of reviewing BCI's deliveries resulted in poor control over its inventory.  This problem was exacerbated as to BCI deliveries to the extent Defendant was given leeway to deliver how and when he pleased based on his personal relationship with Andoni.

*B. May 2015 Confrontation*

With this backdrop, sometime in 2014, Lopez was promoted to manage the restaurant and, in the words of Artiach, to "drain the swamp" in the wake of various operational struggles.  Lopez reportedly fired many employees, brought on new staff, revamped the menu, and took a hard look at Plaintiff's business processes, including a review of vendors and inventory.

At some point in early 2015, Lopez began to suspect Defendant was not delivering all of the tuna, olives, pimientos, and wine he claimed he delivered on BCI's invoices.  She also suspected he was claiming to have delivered products that were actually being delivered by a third-party vendor, Food Services of America ("FSA").  Based on her suspicions, Lopez hoped to use security cameras to catch Defendant "red-handed" in the act of underdelivering BCI products to Plaintiff.

This led to a confrontation involving Lopez, Artiach, and Defendant in May 2015 ("May 2015 Confrontation").  Defendant believed he had been summoned to the restaurant for a wine tasting, but upon his arrival, Lopez and Artiach confronted him and accused him of stealing from Plaintiff by billing them for products that were not actually delivered.  Specifically, Lopez and Artiach claim Defendant said he had delivered

MEMORANDUM OF DECISION − 5

products the day before.  Lopez and Artiach testified that Defendant did not appear on the cameras when he stated the products were delivered, and they could not locate the products on the invoice related to the alleged delivery.

Lopez and Artiach testified that they confronted Defendant and reviewed a segment of security camera footage with him.  After viewing the video, Lopez and Artiach allege Defendant admitted his wrongdoing, started crying, asked them not to tell his family or call the police, and agreed to repay Plaintiff for the products he had not delivered.  In direct contradiction to this testimony, Defendant testified he did not admit his wrongdoing, cry, or plead for mercy.  Instead, Defendant claimed he was taken aback by the accusations and left without making any promise to repay because he had done nothing wrong.  After the May 2015 Confrontation, Lopez contacted the Boise Police Department, who questioned Defendant regarding Plaintiff's allegations of theft.  The matter was referred to the Ada County Prosecutor's Office, but no charges were brought against Defendant.  Defendant did not make any payments to Plaintiff after the May 2015 Confrontation, and Defendant and his sister dissolved BCI on August 5, 2015.

Plaintiff points to five specific occasions on which Defendant underdelivered products to Plaintiff in the months leading up to the May 2015 Confrontation:

//

//

//

//

MEMORANDUM OF DECISION – 6

| Invoice Date | Invoice Amount | Products | Exhibit |
|---|---|---|---|
| January 20, 2015 | $1,126 | Tuna, pimientos, olives, wine, other | Ex. 101 at 35. ("January 20 Invoice") |
| April 14, 2015 | $880 | Tuna, pimientos, olives | Ex. 101 at 31. ("April 14 Invoice") |
| April 28, 2015 | $890 | Tuna, pimientos, olives | Ex. 101 at 33. ("April 28 Invoice") |
| April 30, 2015 | $270 | Wine | Ex. 101 at 32. ("April 30 Invoice") |
| May 11, 2015 | $1,220 | Tuna, pimientos, olives | Ex. 101 at 34. ("May 11 Invoice") |

Plaintiff alleges Defendant made a fraudulent misrepresentation on each of these occasions when he intentionally charged Plaintiff for products he did not deliver as stated on the invoices.  Dkt. No. 163 at 6.  On March 30, 2018, Plaintiff filed a Complaint in Ada County District Court, seeking damages based on Defendant's fraud.  On May 2, 2018, Eduardo and Heather Sarria filed for bankruptcy.[4]  On June 11, 2018, Plaintiff filed this adversary complaint, asking the Court to determine both the amount of damages and the nondischargeability of any fraudulently obtained amount.  Plaintiff seeks $10,000 in total damages which includes $3,260, based on the five invoices from 2015 referenced above, plus an additional $6,740 in estimated damages for 2014.

---

[4] Case No. 18-005720-JMM (Bankr. D. Idaho).

MEMORANDUM OF DECISION – 7

*C. Key Witness Testimony: Amy Wray and Dmitri Arutiunov*

As a part of their case-in-chief, Plaintiff's counsel called two key witnesses to testify regarding their experiences with Defendant and BCI. The first witness was Amy Wray ("Wray"), the managing partner of another Boise restaurant, the Cottonwood Grille. Wray testified that in late 2014, on twelve occasions over the course of six months, Defendant charged Cottonwood Grille for pimientos that were not ever delivered by BCI. Wray confronted Defendant about the missing products, and Defendant responded emotionally, acknowledged his failure to properly deliver all of the products, and promised to repay over $6,000 to Cottonwood Grille based on the value of the undelivered goods. Wray indicated Defendant made one payment of $400 but did not make any subsequent payments. Notably, Wray also testified that Cottonwood Grille had formal procedures that applied to vendor delivery check-in, but BCI was not held to the same standards other vendors were held to because of the personal relationship between Defendant, Wray, and the Cottonwood Grille's chef. As a result, Wray said she was not careful with the invoices, and was defrauded by Defendant, suffering damages of over $6,000. She concluded her testimony by asserting she had no doubt that Defendant had intentionally failed to deliver the pimientos.

The second key witness for Plaintiff was Dmitri Arituinov ("Arituinov"), a sales representative for FSA at the time of Defendant's disputed deliveries to Plaintiff in early 2015. Arituinov testified he visited the restaurant twice per week starting in 2014, spending substantial time with Lopez and Plaintiff's kitchen staff in the food storage area.

MEMORANDUM OF DECISION – 8

He worked with Lopez to re-organize the food storage area, develop a menu, and to control Plaintiff's food costs by thoroughly evaluating the restaurant's food delivery needs.

Prior to the May 2015 Confrontation, Arituinov testified that Lopez approached him with BCI invoices reflecting recent deliveries of pimientos, tuna, olives, and wine. Arituinov was struck by the quantities of certain products BCI purported to deliver. Per Arituinov, FSA regularly delivered pimientos to Plaintiff, yet there were never more than six cans of pimientos on the shelf in the food storage area, despite BCI's claim to have delivered twelve cans of the same pimientos. Based on his intimate knowledge of the food storage area and the extent and timing of his own pimiento deliveries, Arituinov concluded Defendant was not delivering the pimientos as alleged on the invoices.

Arituinov also testified he did not believe Defendant was delivering cases of tuna he purported to deliver during April and May 2015. According to Arituinov, tuna had been taken off the menu in early 2015 and the same five cans of tuna had been on the shelf for three months. Even so, Defendant still claimed to have delivered six cases of tuna containing eight cans each during April and May 2015. Arituinov concluded Defendant was not delivering tuna as alleged on the invoices.

### Analysis and Disposition

A. Applicable Law: Section 523(a)(2)(A)

"Generally a debtor is permitted to discharge all debts that arose before the filing of his bankruptcy petition . . . but the Bankruptcy Code provides for certain exceptions to

MEMORANDUM OF DECISION − 9

that general rule." *Gugliuzza v. Fed. Trade Comm'n (In re Gugliuzza)*, 852 F.3d 884,

888 (9th Cir. 2017) (citing *Hawkins v. Franchise Tax Bd.*, 769 F.3d 662, 666 (9th Cir.

2014). Under Section 523(a)(2)(A), debts obtained by "false pretenses, a false

representation, or actual fraud" are not dischargeable.

> The exception to dischargeability of debts under § 523(a)(2)(A) strikes a
> balance between competing goals. In order to avoid unjustifiably impairing
> a debtor's fresh start, [the Ninth Circuit has] held that the exception "should
> be construed strictly against creditors and in favor of debtors." *Klapp v.
> Landsman (In re Klapp)*, 706 F.2d 998, 999 (9th Cir. 1983); *cf. Beaupied v.
> Chang (In re Chang)*, 163 F.3d 1138, 1140 (9th Cir. 1998) (discussing the
> competing policies of "fresh start" and enforcement of domestic support
> obligations embodied in § 523(a)(5)). At the same time, [the Circuit has
> recognized] that Congress created the exception "to prevent a debtor from
> retaining the benefits of a property obtained by fraudulent means and to
> ensure that the relief intended for honest debtors does not go to dishonest
> debtors." *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re
> Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000).

*Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010).

> To establish nondischargeability under § 523(a)(2)(A), a creditor must
> prove five elements: "(1) misrepresentation, fraudulent omission or
> deceptive conduct by the debtor; (2) knowledge of the falsity or
> deceptiveness of his statement or conduct; (3) an intent to deceive; (4)
> justifiable reliance by the creditor on the debtor's statement or conduct; and
> (5) damage to the creditor proximately caused by its reliance on the
> debtor's statement or conduct."

*Gugliuzza*, 852 F.3d at 888 (quoting *Slyman*, 234 F.3d at 1085). Since "[d]irect evidence

of knowledge and fraudulent intent is rarely present; instead, [p]laintiff may prove

knowledge and intent through circumstantial evidence." *Fetty v. DL Carlson Enters.,

Inc. (In re Carlson)*, 426 B.R. 840, 855 (Bankr. D. Idaho 2010) (citing *Cowen v. Kennedy

(In re Kennedy)*, 108 F.3d 1015, 1018 (9th Cir. 1997)). The plaintiff bears the burden of

MEMORANDUM OF DECISION − 10

proving each of these elements by a preponderance of the evidence. *Sabban*, 600 F.3d at 1222 (internal citations omitted).

*B. Analysis*

### 1. Misrepresentation, Fraudulent Omission, or Deceptive Conduct

Plaintiff contends this element is met because Defendant fraudulently misrepresented what BCI delivered on the invoices submitted to Plaintiff for payment. Dkt. No. 163 at 6. Per Plaintiff, those invoices misrepresented that the products Plaintiff was expected to pay for were actually delivered by BCI when, in fact, they were not. *Id.* While Plaintiff alleges Defendant consistently failed to deliver goods throughout 2014 and 2015, it specifically points to five invoices from January through May 2015 as examples of Defendant's misrepresentations. *See* Ex. 101 at 31–35. Defendant's reply to these allegations is simple: There was no misrepresentation or fraud because "BCI delivered all the products that were invoiced to the Plaintiff." Dkt. No. 158 at 6.

As Plaintiff pointed out in its pretrial memorandum, as a matter of law, it is clear enough that the presentation of invoices for payment for goods that were not delivered constitutes a misrepresentation for the purposes of § 523(a)(2)(A). *See, e.g.*, *Giglio v. Nisivoccia (In re Nisivoccia)*, 502 B.R. 139, 156 (Bankr. E.D.N.Y. 2013) (holding that presentation of an invoice seeking payment for goods which are never delivered is a false representation); *Godowns v. Brush (In re Brush)*, 460 B.R. 448, (Bankr. D.S.C. 2011) (presenting inaccurate invoices with inappropriately inflated costs is a false representation); *Bartley v. Jacobson (In re Jacobson)*, 485 B.R. 255, 261 (finding a false

MEMORANDUM OF DECISION − 11

representation where a contractor presented an invoice for $20,995 for services where $13,500 was the true amount of the charges).  Thus, here, the factual issue is whether or not Defendant delivered all of the products for which he charged Plaintiff.

At trial, Lopez reviewed each invoice with Plaintiff's counsel and testified that Defendant did not deliver any of the tuna, pimientos, olives, and non-cooking wine invoiced on five invoices from 2015.  Lopez said she suspected Defendant was not making full deliveries prior to May 2015, but because Defendant was a family friend of the Artiachs, she did not want to accuse the Defendant of providing false invoices without further proof.  To gather more proof, Lopez used video from security cameras, along with information from Artiach, to conclude that Defendant failed to deliver tuna, pimientos, and olives listed on the May 11 Invoice.  This led to the aforementioned May 2015 Confrontation during which Artiach and Lopez accused Defendant of failing to make full delivery.  Per Lopez, Defendant had said he had been there "the day before" to make a delivery, but that she reviewed camera footage from that day and did not see that Defendant had delivered as indicated on the May 11 Invoice.[5]

---

[5] The alleged camera footage is missing and was not introduced into evidence at trial.  Thus, the Court does not give weight to Ms. Lopez's testimony of what was actually on the missing footage, but does give limited credit to her explanation, based on her personal knowledge, of the events leading up to the May 2015 Confrontation.  Even so, Lopez's account of the May 2015 events is given limited weight.  At one point, she testified Defendant did not make any delivery on the May 11 Invoice at all, but at another point, she asserted that the red and white cooking wine listed on the May 11 Invoice was delivered, and it was only the tuna, pimientos, and olives listed on that invoice that were not delivered.

MEMORANDUM OF DECISION – 12

Lopez's account of non-delivery in May 2015 was partially corroborated by Artiach's testimony. Artiach testified that he was cooking in the kitchen in May 2015 when Defendant showed up at the restaurant seeking payment on an invoice for products delivered the day before. Artiach reportedly asked "What money? I was here yesterday and you didn't come, so when did you deliver it?" The testimony of Lopez and Artiach, in concert, does not create a clear timeline of events, but reportedly, this exchange led Lopez and Artiach to suspect Defendant did not deliver the products listed on the May 11 Invoice, and thus, to the May 2015 Confrontation.

Apart from providing an unclear timeline of events, the testimony of Lopez and Artiach regarding the May 2015 Confrontation was otherwise consistent. They both testified they confronted Defendant and accused him of charging Plaintiff for tuna, pimientos, and olives they believed had not been delivered. Then, Defendant admitted his wrongdoing, cried, asked that they not call the police or his family, and agreed to repay Plaintiff for the missing products. Lopez reported there was a discussion about Defendant signing over his car title in lieu of payment of the amount allegedly due because he did not have sufficient funds to repay Plaintiff.

At trial, Defendant testified to a different version of events. He persistently denied he made a misrepresentation on any invoice and insisted that "if he invoiced it, it was delivered." As to the May 2015 Confrontation, he denied he admitted his wrongdoing, pled for mercy, and agreed to repay Plaintiff. Defendant said he had excess tuna, pimientos, and olives at home, and therefore, he would never have created false invoices

MEMORANDUM OF DECISION − 13

for those products because he had them in stock, and he simply would have delivered the inventory he had on hand.

The competing testimony of Lopez and Artiach on the one hand, and Defendant on the other, leaves the Court to consider two starkly different versions of the May 2015 Confrontation and the events leading up to it.  To resolve these differing accounts, the Court turns to Arituinov's testimony on the subject of the invoices and the products delivered by BCI in April and May 2015.  Arituinov testified in great detail, based on his personal knowledge of the restaurant's food storage area, that he did not believe Defendant had delivered tuna or pimientos during April and May 2015.  He described where the tuna and pimientos were stored.  He testified that the pimientos were the exact same product he had been delivering throughout the previous year, and that there were never more than six cans on the shelf, yet Defendant had repeatedly invoiced deliveries of twelve cans (two cases of six cans each) of pimientos at the same time FSA was delivering the same product.  Arituinov explained he did not believe BCI had delivered the tuna listed on the April and May 2015 invoices because tuna had been taken off the menu months earlier, and the same five cans of tuna had been sitting on a specific shelf in the food storage area during that entire time.  As such, Arituinov claimed he had specific knowledge that Defendant had not delivered six cases of tuna (containing eight cans each) during the forty-five-day period leading up to the May 2015 Confrontation.

It is difficult to reconcile the competing versions of events supplied by Plaintiff and Defendant, but the Court finds no reason to doubt the veracity of Arituinov's

MEMORANDUM OF DECISION − 14

testimony and gives it substantial weight in this matter.  Arituinov's detailed account of

the workings of the food storage area as it relates to tuna and pimientos leads this Court

to find Plaintiff has shown by a preponderance of the evidence that Defendant failed to

deliver all of the products he charged Plaintiff for on the April 14, April 28, April 30, and

May 11 Invoices.  As such, the Court finds Defendant made false misrepresentations for

the purposes of § 523(a)(2)(A) when he presented false invoices to Plaintiff for payment

on those four occasions during April and May 2015.

### 2. Knowledge of Falsity and Intent to Deceive

In a § 523(a)(2)(A) action, the elements of knowledge of falsity and the intent to

deceive are often closely related.  As discussed above, it is rare that a defendant will

admit to his state of mind or subjective intent with respect to fraudulent conduct.  As

such, these elements can be proved using inferences drawn from circumstantial evidence.

Here, the Court has already found that Defendant made misrepresentations regarding

April and May 2015 invoices, so the issues are whether he made those misrepresentations

knowing they were false, and with the intent to deceive.

Here, Lopez and Artiach both testified that Defendant admitted to his wrongdoing

during the May 2015 Confrontation.  Artiach remembered the encounter "like it was

yesterday" and recalled that Defendant said, "don't call my family," "don't call the cops,"

and "I am sorry for what happened."  Lopez testified to a similar version of events,

suggesting Defendant admitted he had not delivered what was listed on the invoices,

cried, requested that no one call his family or the police, and agreed to repay Plaintiff for

MEMORANDUM OF DECISION − 15

the products that were not delivered.  Taken at face value, such testimony suggests

Defendant was aware he made a false misrepresentation with the intent to deceive

Plaintiff when he submitted invoices with charges for products that were not delivered.

Otherwise, it is fair to assume he would have responded differently by denying

wrongdoing and claiming he had delivered everything that was listed on the invoices.

And, in fact, Defendant testified that was exactly what he did, leaving the Court to again

weigh the relative veracity of the conflicting testimony of the parties.

With this conflicting testimony as a backdrop, the Court turns its attention to

Wray's testimony about her experience with BCI as the managing partner of the

Cottonwood Grille.  Federal Rule of Evidence 404(b)(1) prohibits consideration of

"[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to

show that on a particular occasion the person acted in accordance with that character."

However, such evidence may be "admissible for another purpose, such as proving

motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or

lack of accident."  Fed. R. Evid. 404(b)(2).  Here, Wray's testimony is relevant to

deciding whether Defendant's failure to deliver products was a mistake or an accident,

which is in turn relevant to this Court's determination of whether he did so knowingly,

and with the intent to deceive.

Per her own admission, Wray was a "social friend" of Defendant and thus, she

seemed understandably reluctant to testify.  She presented as a highly credible witness.

She testified that, in the latter half of 2014, just a few months before the alleged conduct

MEMORANDUM OF DECISION − 16

in this matter, Defendant charged Cottonwood Grille for pimientos that he failed to deliver on twelve separate occasions in a six-month time period. She said that when she confronted Defendant, he admitted he had not delivered all of the pimientos listed on the invoices and agreed to repay her an amount in excess of $6,000. She testified he made one payment of $400 but made no other payments because he had no money with which to do so. Interestingly, Wray also said that she had allowed Defendant to adhere to relaxed standards for checking in products when deliveries were made, just as Andoni had said he had done with respect to the deliveries Defendant made to Plaintiff. At the conclusion of her testimony, Wray said she had no doubt Defendant intentionally provided false invoices to the Cottonwood Grille intentionally. When asked about Wray's allegations, Defendant claimed he did not remember the incident, but that if Wray said it happened, then it happened.

The Federal Rules of Evidence prevent this Court from using Wray's testimony to conclude Defendant failed to deliver pimientos to the Plaintiff just because Wray reported he did the same thing to the Cottonwood Grille. However, this Court may use Wray's testimony as evidence that Defendant knew how to use BCI as a mechanism to invoice restaurants for goods that he did not deliver. That is, he was aware of how to execute such a scheme, and the disparities between the invoices and what was actually delivered were no accident. Further, Defendant did not adduce any evidence of mistake or accident with respect to the incident at the Cottonwood Grille, nor any evidence of mistake or accident with respect to the April and May 2015 deliveries to Plaintiff. Instead, the

MEMORANDUM OF DECISION − 17

Defendant claimed that, as to Plaintiff, "if I invoiced it, then I delivered it," but that as to Cottonwood Grille, if Wray says I invoiced it and I did not deliver it, then she must be right. At a minimum, the Court credits Wray's testimony as a significant factor in weighing the credibility of Defendant's testimony regarding his knowledge of the falsity of the invoices and his intent to deceive Plaintiff.

On balance, the Court finds that Defendant was aware of the falsity of the April and May 2015 invoices at the time that he presented them to Plaintiff for payment, and he presented those invoices with the intent to deceive Plaintiff into believing he had delivered goods that he had not actually delivered. Plaintiff has proved knowledge of falsity and intent to deceive by a preponderance of the evidence.

### 3. Justifiable Reliance

The next issue is whether Plaintiff was justified in relying on Defendant's April and May 2015 invoices. To determine whether such reliance was justifiable, this Court must consider the "qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Carlson*, 426 B.R. at 855 (quoting *Field v. Mans*, 516 U.S. 59, 71 (1995)).

Here, Plaintiff is a small, family-owned business that Artiach testified he created to promote and celebrate Basque culture. Boise's Basque community is a vibrant one, and both the Artiachs and the Sarrias are Basque and are proud to actively participate in local Basque cultural events. Artiach came to the United States from the Basque Country

MEMORANDUM OF DECISION – 18

in the 1960's and eventually owned and operated a successful trucking company among other business enterprises.  Prior to opening Leku Ona in 2005, he did not have experience as a restauranteur.  The Artiachs and Sarrias had known each other vis-à-vis the Basque community for years.  Artiach, Andoni, Defendant, and Heather Sarria all testified to a longstanding, albeit occasionally strained, relationship between the families.

In 2011, despite his initial reservations based on a mistrust of Defendant's father, Artiach decided to set aside past family grievances and provide Defendant, a fellow member of the Basque community, with an opportunity to supply imported Basque food and wine to Plaintiff.  Their business relationship was established informally, based on trust, and no formal contract was executed so as to clarify the terms of their supply agreement. Other, larger vendors, such as Sysco and FSA, came to Plaintiff armed with more sophisticated check-in procedures, but BCI was admittedly a smaller business that, by 2014 and 2015, used one delivery driver (Defendant) and provided simple, hand-written invoices to its customers.

Regrettably, Plaintiff did not have sophisticated procedures for checking in inventory prior to payment of invoices.  Plaintiff's delivery check-in process, to the extent one existed at all, was at best haphazard and poorly controlled.  Testimony at trial revealed Plaintiff historically experienced myriad problems controlling its inventory of wine, food, and knives.  One specific result of this lack of control was alleged thefts of wine and knives during 2014.  On the whole, Plaintiff's lack of control over its inventory at the time can fairly be characterized as unreasonable.

MEMORANDUM OF DECISION – 19

However, under these circumstances, Plaintiff's informality was justifiable based on the fundamental assumption that BCI would deliver what Defendant said it delivered. Artiach testified that Plaintiff's employees didn't always inspect the goods delivered by BCI because they trusted Defendant, as a friend of the family and fellow member of the tight-knit Basque community, to do the right thing and deliver as promised. Andoni and Lopez testified that Defendant was given special leeway to deliver even when no one was available to check in the delivery. In short, it was justifiable for Plaintiff to rely on Defendant's invoices.

Defendant's counsel delicately tried to argue that it was unjustifiable for Plaintiff to rely on the invoices because its control over their restaurant and inventory was inadequate, and if there would have had better control, someone would have noticed something was amiss sooner. The import of this argument, however, is belied by the testimony of Defendant himself, who steadfastly reported that "if he invoiced it, he delivered it," suggesting that even if Plaintiff had better control over its inventory, it would not have mattered because there would not have been any evidence suggesting Defendant was doing anything wrong in the first place. In other words, Defendant himself testified that it was justifiable for Plaintiff to rely on his invoices because they were all correct.

Further, once Lopez and Artiach's suspicions were aroused, Lopez took action by reviewing security camera footage in an effort to deter future problems with theft and

MEMORANDUM OF DECISION − 20

inventory control.  Plaintiff did not blindly rely on the April and May 2015 invoices.
Aware of a possible problem, Plaintiff took affirmative steps to find out the truth.

In the end, it is undisputed that Plaintiff had poor control over its inventory check-in procedures in 2014 and 2015.  Were this Court to apply a community standard to these facts, it might well find the restaurant's processes were unreasonable.  But here, the issue is whether it was subjectively justifiable, based on the characteristics of this particular Plaintiff and the circumstances described above, for Plaintiff to rely on Defendant's invoices.  The Court concludes it was justifiable for Plaintiff to rely on Defendant's invoices because Plaintiff was a small, unsophisticated restaurant.  The supply agreement was entered into based on a relationship of trust between two family members that had known each other for many years and because of a shared respect for Basque culture. Defendant himself testified there was no reason for Plaintiff not to rely on BCI's invoices, because they were all correct.  The Court finds Plaintiff's reliance on Defendant's invoices was justifiable, and this element of Plaintiff's claim has been proved by a preponderance of the evidence.

### 4. Damages

Lastly, to prevail, Plaintiff must prove its damages were proximately caused by Defendant's conduct and "the specific amount of the damage caused by the fraudulent representation." *Carlson*, 426 B.R. at 858.  The proper measure of damages in a § 523(a)(2)(A) action is found in § 549 of the Restatement (Second) of Torts (1977):

MEMORANDUM OF DECISION − 21

> (1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including
>> (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
>> (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.
> (2) The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

In certain situations, courts may award estimated damages where certain problems of proof exist.  The Ninth Circuit's Bankruptcy Appellate Panel has explained:

> Where a "defendant by his own wrong has prevented a more precise computation . . . [a court] may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).  "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.  It would be an inducement to make wrongdoing so effective and complete in every case as to preclude recovery, by rendering the measure of damages uncertain."  *Id.* at 264–65.

*Lundell v. Ulrich (In re Lundell)*, 236 B.R. 720, 725 (9th Cir. BAP 1999); *see also*

*Saccheri v. St. Lawrence Valley Dairy (In re Saccheri)*, #09-1273, 2012 WL 5359512 at

*7 (9th Cir. BAP Nov. 1, 2012).

Here, Plaintiff alleges it suffered damages proximately caused by Defendant's

conduct when Defendant provided invoices Plaintiff believed to be correct, and Plaintiff

paid those invoices but failed to receive the billed-for products.  Plaintiff seeks $3,260 in

discretely provable damages it claims arose in 2015 and an additional $6,740 in estimated

MEMORANDUM OF DECISION − 22

damages for 2014.[6]  Per Plaintiff, these are the proper amounts of damages because they represent the difference between the value of what it received from Defendant's deliveries and the money it paid to Defendant based on the BCI invoices.

a. 2015 Damages

i. January 20 Invoice

The January 20 Invoice includes charges for the following:

| Quantity | Description | Cost | Total Cost |
|----------|-------------|------|------------|
| 2 cs. | White Cooking Wine | 30.00 | 60.00 |
| 2 cs. | Tuna | 240.00 | 480.00 |
| 1 cs. | Pimientos | [BLANK] | 150.00 |
| 2 cs. | Olives | 50.00 | 100.00 |
| | | | Food Total = $790.00 |

---

[6] Plaintiff failed to make it clear why it only seeks $3,260 in damages for 2015.  In its pretrial memorandum, it alleged to have suffered the following damage amounts:

(1) January 20 Invoice:   $1,126

(2) April 14 Invoice:   $880

(3) April 28 Invoice:   $890

(4) April 30 Invoice:   $270

(5) May 11 Invoice:   $1,220

These five invoices total $4,386, an amount not referenced by Plaintiff if its briefs or argument.  The Court notes $3,260 is the total amount of damages for the four invoices issued during April and May 2015.  Plaintiff's failure to account for this discrepancy is unclear, but the Court will nonetheless address each of the five invoices in turn, as well as Plaintiff's claim of estimated damages for 2014.

MEMORANDUM OF DECISION − 23

| [Quantity] | [Description] | [Cost] | [Total Cost] |
|:---:|:---:|:---:|:---:|
| 6 b. | Feliciana Tempranillo | 11.50 | 69.00 |
| 1cs. | Medrano Reserva | 22.00 | 264.00 |
| | | | Wine Total = $396.00 |

Ex. 101 at 35.

Lopez testified that none of the products on this invoice were delivered, suggesting the possibility of $1,186 in damages.  Defendant testified he delivered all of these products in full.

Beginning with the wine, the Court finds there was no credible testimony suggesting the wine was not delivered.  Lopez was the only witness to testify the wine was not delivered, but the potential veracity of her testimony on the subject is overshadowed by testimony that Plaintiff had a history of doing a poor job of accounting for its wine.  Lopez and Andoni both confirmed wine had been stolen during 2014, but that in late 2014 and early 2015, wine started to reappear in odd places throughout the restaurant.  The problem with the theft of wine was significant enough it was reported to the Boise Police Department.  This invoice was issued in January 2015, during a time when it would have been difficult to tell whether the wine was (1) not delivered by Plaintiff, (2) stolen by Plaintiff's employees, or (3) otherwise improperly accounted for.

MEMORANDUM OF DECISION – 24

Plaintiff failed to produce records demonstrating that the wine was not in fact delivered.[7]

Lopez's declaration that the wine was stolen was not supported by sufficient

accompanying details so as to convince the Court the wine was not delivered. As such,

the Court finds no damages shall be awarded for the wine listed on the January 20

Invoice.

Next are the olives and the cooking wine. Again, Lopez testified that these items

were not delivered. Defendant testified they were delivered. Lopez did not describe in

detail how she knew the olives and the cooking wine were not delivered, instead only

offering a conclusory allegation that, without further accompanying details, the Court

finds unpersuasive.[8] Due to the lack of corroborating testimony from other witnesses, the

Court finds no damages shall be awarded for the olives and cooking wine listed on the

January 20 Invoice.

Finally, the Court will consider the tuna and the pimientos. Lopez testified these

items were not delivered but provided no details beyond her conclusory allegation.

Defendant testified they were delivered. Arituinov gave persuasive testimony that, upon

---

[7] Testimony at trial indicated that Plaintiff did in fact have software provided by Bevinco that it used to control its alcohol inventory. No Bevinco records were introduced into the record or referred to in any detail during two days of trial.

[8] For example, as to the olives, Lopez simply testified that "For the price of the olives, it was not making any sense and that was never going to be." This testimony falls short of establishing she had personal knowledge that the olives listed on any specific invoice were not delivered. Further, since Plaintiff did not adduce evidence of market prices for individual products at trial, Lopez's comment about the price of the olives does not prove Plaintiff was damaged based on a theory that Defendant overcharged Plaintiff.

MEMORANDUM OF DECISION – 25

his review of April 2015 and May 2015 invoices during May 2015, he did not believe the tuna and pimientos had been delivered because he had specific knowledge of the inventory in the food storage area during April 2015 and May 2015. As to the tuna, Arituinov said it had been pulled off the menu roughly "three months ago," which would have been around January or February 2015. He also testified he had seen the same cans of tuna and pimientos on the shelves in the weeks leading up to the May 2015 Confrontation. However, Arituinov never gave specific testimony that tuna and pimientos were not delivered in January 2015. As such, Plaintiff has failed to carry its burden of proving damages as to the tuna and pimientos, and the Court awards no damages for those items based on the January 20 Invoice.

ii. April 14 Invoice

The April 14 Invoice includes charges for the following:

| Quantity | Description | Cost | Total Cost |
|----------|-------------|------|------------|
| 2 cs. | White Cooking Wine | 30.00 | 60.00 |
| 2 cs. | Ortiz Tuna | 240.00 | 480.00 |
| 2 cs. | Pimientos | 150.00 | 300.00 |
| 2 cs. | Olives | 50.00 | 100.00 |
| | | | Total = $940.00 |

Ex. 101 at 31.

MEMORANDUM OF DECISION − 26

Lopez testified the tuna, pimientos, and olives on this invoice were not delivered. As to the tuna, Lopez said she knew it was not delivered because it had been taken off the menu in late 2014 or early 2015.  As to the pimientos, Lopez said the pimientos in the food storage area were being delivered by Arituinov and FSA, not Defendant.  As to the olives, as discussed above, Lopez's testimony lacked sufficient substantive detail so as to persuade the Court the olives were not delivered.  Regarding this invoice, Defendant again testified that all of the products were delivered.

As discussed above, Arituinov gave specific testimony about why he believed the tuna and the pimientos had not been delivered during April and May 2015 based on his detailed knowledge of the food storage area and the restaurant's menu at the time. However, again, Arituinov was silent on the olives, claiming no special knowledge of how they were delivered, who they might have been delivered by and when, and how much of the product the restaurant required.

Based on the foregoing, the Court finds Plaintiff established that the tuna ($480) and the pimientos ($300) were not delivered.  Total damages based on the April 14 invoice are $780.[9]

### iii. April 28 Invoice

The April 28 Invoice includes charges for the following:

---

[9] Ex. 101, Plaintiff Bates 2677 includes a copy of a cleared check for $940, payable to BCI, that reflects the April 14 Invoice was paid in full.

MEMORANDUM OF DECISION − 27

| Quantity | Description | Cost | Total Cost |
|----------|-------------|------|------------|
| 2 cs. | Red Cooking Wine | 30.00 | 60.00 |
| 2 cs. | White Cooking Wine | 30.00 | 60.00 |
| 1 cs. | Tuna | [BLANK] | 240.00 |
| 3 cs. | Pimientos | 150.00 | 450.00 |
| 4 cs. | Olives | 50.00 | 200.00 |
| | | | Total = $1,010.00 |

Ex. 101 at 33.

Lopez testified the cooking wines listed on this invoice were delivered, but the tuna, pimientos, and olives were not delivered.  Her testimony as to her knowledge of the tuna, pimientos, and olives on the April 14 Invoice applies with equal force to this invoice.  Defendant testified the products were delivered in full.  Arituinov's testimony as to the tuna and pimientos on the April 14 Invoice also applies to this invoice, but Arituinov again expressed no opinion on the olives.

Based on the foregoing, the Court finds Plaintiff established the tuna ($240) and pimientos ($450) were not delivered.  Total damages based on the April 28 Invoice are $690.[10]

---

[10] Ex. 101, Plaintiff Bates 2686 includes a copy of a cleared check for $1,280, payable to BCI, that reflects the April 28 and April 30 Invoices were paid in full.

MEMORANDUM OF DECISION – 28

### iv. April 30 Invoice

The April 30 Invoice includes charges for the following:

| Quantity | Description | Cost | Total Cost |
|----------|-------------|------|------------|
| 1 cs. | Fabla Tempranillo | 10.00 | 120.00 |
| 1 cs. | Sagardoa | 12.50 | 150.00 |
| | | | Total = $270.00 |

Ex. 101 at 32.

Plaintiff claims damages of $270 because this wine was not delivered.  Lopez

testified it was not delivered, and Defendant says it was.  As was the case with the wine

listed on the January 20 invoice, the Court is not persuaded the Plaintiff had sufficient

control over its inventory of wine so as to award any damages based on this invoice.

### v. May 11 Invoice

The May 11 Invoice includes charges for the following:

| Quantity | Description | Cost | Total Cost |
|----------|-------------|------|------------|
| 2 cs. | Red Cooking Wine | 30.00 | 60.00 |
| 2 cs. | White Cooking Wine | 30.00 | 60.00 |
| 3 cs. | Ortiz Tuna | 240.00 | 720.00 |
| 2 cs. | Pimientos | 150.00 | 300.00 |
| 4 cs. | Olives | 50.00 | 200.00 |
| | | | Total = $1,340.00 |

MEMORANDUM OF DECISION − 29

Ex. 101 at 34.

Lopez testified the cooking wines listed on this invoice were delivered, but that the tuna, pimientos, and olives were not delivered.  Her testimony as to the tuna, pimientos, and olives on the April 14 Invoice applies with equal force to this invoice. Defendant testified the products were delivered in full.  Arituinov's testimony as to the tuna and pimientos on the April 14th Invoice also applies to this invoice—but he again expressed no opinion on the delivery of the olives.

Based on the foregoing, the Court finds Plaintiff established the tuna ($720) and pimientos ($300) were not delivered.  Total damages based on the May 11 Invoice are $1,020.[11]

### vi. Summary

After its review of the five disputed invoices from 2015, the Court finds that Plaintiff established that it suffered total damages of  $2,490 by a preponderance of the evidence, as outlined below:

//

//

//

//

---

[11] Ex. 101, Plaintiff Bates 2696 includes a copy of a cleared check for $1,340, payable to BCI, that reflects the May 11 Invoice was paid in full.

MEMORANDUM OF DECISION – 30

| Invoice Date | Amount of Damages |
|:---:|:---:|
| April 14 | $780 |
| April 28 | $690 |
| May 11 | $1,020 |
| Total | $2,490 |

b. 2014 Estimated Damages

Plaintiff also claims additional damages of $6,740 for 2014 based on a theory that the damages cannot be calculated with certainty due to Defendant's wrongdoing. Under these facts, the Court roundly rejects this argument. The specific amount of damages for 2014 may well be difficult to prove, opening up the possibility that such damages could be estimated. However here, there were no specific allegations and details proving Defendant failed to deliver products during 2014. Thus, Plaintiff's claim for estimated damages must fail because Plaintiff has not convinced the Court that Defendant did not deliver products during 2014, not because the amount of damages suffered as a result are unclear. Furthermore, Plaintiff's problems proving estimated damages were not exclusively caused by Defendant. While it is true Defendant did not have all of the 2014 invoices relevant to this action, it is also true that Plaintiff destroyed its own copies. Lastly, if Plaintiff had kept better records and control over vendor deliveries and its own inventory, it likely would have had an easier time detecting and discerning any damages it may have suffered during 2014, as well as the specific amount of those damages.

MEMORANDUM OF DECISION − 31

Based on this record, the Court finds Plaintiff failed to establish its entitlement to estimated damages of $6,740 for 2014.

### *Conclusion*

The Court finds that Plaintiff has proved all of the elements of its § 523(a)(2)(A) action against Defendant.  Plaintiff is hereby awarded damages of $2,490.  Therefore, the sum of $2,490.00 is determined to be non-dischargeable by the Defendant Eduardo L. Sarria.  A separate judgment will be entered.

DATED:  June 25, 2019

_____
JOSEPH M. MEIER
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION − 32